## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| DANIEL OLDJA, | ) | CASE NO. 5:23-CV-01170-JDA |
| Plaintiff, | ) | |
| | ) | U.S. MAGISTRATE JUDGE |
| v. | ) | JENNIFER DOWDELL ARMSTRONG |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | **MEMORANDUM OPINION AND** |
| SECURITY, | ) | **ORDER** |
| | ) | |
| Defendant, | ) | |
| | ) | |

### I.      INTRODUCTION

Plaintiff, Daniel Oldja ("Mr. Oldja"), seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner")[1] denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF No. 1.) This matter is before me pursuant to 42 U.S.C. §§ 405(g) and Local Rule 72.2(b). (ECF non-document entry dated June 12, 2023.) The parties have consented to the jurisdiction of this Court pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1. (ECF No. 6.) For the reasons set forth below, the Court AFFIRMS the Commissioner's decision DENYING Mr. Oldja's applications for SSI and DIB.

### II.      PROCEDURAL HISTORY

On January 28, 2015, Mr. Oldja was found disabled beginning in 2013. (Tr. 95-105.)[2] However, his disability benefits ceased in 2017 because he failed to cooperate with a continuing disability review which resulted in insufficient evidence to establish his continuing disability. (Tr.

---

[1] On December 20, 2023, Martin O'Malley became the Commissioner of Social Security.

[2] The administrative transcript ("Tr.") appears at ECF No. 5 on CM/ECF. All page number references to the administrative transcript herein are to the Bates numbers on the bottom right-hand corner. All other record references are to the electronically stamped CM/ECF document ("ECF No.") and PageID# rather than any internal pagination.

17, 24.) At the same time Mr. Oldja refused to cooperate with the Social Security Administration ("SSA"), he returned to work, earning between $22,000 and $43,000 per year from 2017 to 2020, which was above the substantial gainful activity level that would have disqualified him from disability benefits. (Tr. 24, 281.)

On August 4, 2021, Mr. Oldja filed applications for DIB and SSI, alleging a disability onset date of December 21, 2020. (Tr. 17, 252, 286.) His applications related to bipolar disorder, epilepsy with reoccurring status epilepticus, chronic generalized pain, pancreatitis with necrosis, cholestasis, demand ischemia, high cholesterol, high blood pressure, chest pain, and headaches that induce anxiety, stress, and seizures. (Tr. 286.) The ALJ's decision also found the following severe impairments: cervical degenerative disc disease; bilateral carpal tunnel syndrome; alcohol-induced pancreatitis; obesity; alcohol and cannabis abuse disorders; and a seizure/conversion disorder. (Tr. 20.) His applications were denied initially and upon reconsideration. (Tr. 155-64, 175-82.)

Mr. Oldja requested a hearing before an administrative law judge ("ALJ") on March 8, 2022. (Tr. 183-84.) The ALJ held an online video hearing on July 14, 2022, at which Mr. Oldja was represented by counsel. (Tr. 39-74.) Mr. Oldja testified, as did an independent vocational expert ("VE"). (*Id.*) On August 17, 2022, the ALJ issued a written decision, finding that Mr. Oldja was not disabled. (Tr. 17-33.) The ALJ's decision became final on April 12, 2023, when the Appeals Council declined further review. (Tr. 1-6.) Mr. Oldja filed a Complaint on June 12, 2023, challenging the Commissioner's final decision. He raises three assignments of error:

(1) The ALJ committed harmful error when he applied the wrong standard of review in failing to adopt the findings of the prior Administrative Law Judge.

(2) The ALJ erred at Step Three of the Sequential Evaluation when he failed to find that Plaintiff satisfied the criteria of Listing 11.02.

2

(3) The ALJ committed harmful error when he failed to properly apply the criteria of Social Security Ruling 16-3p and failed to find that the intensity, persistence, and limiting effects of Plaintiff's symptoms precluded him from engaging in substantial gainful activity on a full-time and sustained basis.

(ECF No. 8, PageID#1845.)

## III.  BACKGROUND

### A.  Personal, Educational, and Vocational Information

Mr. Oldja was born in 1979, and he was 41 years old on the alleged disability onset date. (Tr. 31, 41.) He has a wife and three daughters. (Tr. 47.) He has a driver's license with no medical restrictions. (Tr. 47.) He testified that he stopped driving due to his seizures, but he also stated that his doctor had not placed any medical restrictions on his license or suggested that he relinquish his license due to medical issues. (*Id.*) His license was suspended in April 2020 based on an OVI offense. (Tr. 370, 563.)  His past relevant work was employment as a carpenter and roofer. (Tr. 67.)

### B.  Relevant Medical Opinion Evidence

The only opinions in the record are those of the state agency consultants. In October 2021, Paul Tangeman, Ph.D., reviewed the record at the initial level of consideration and found that Mr. Oldja could concentrate on, understand, and remember simple instructions and occasional detailed and complex instructions; could handle brief and superficial interaction with coworkers and the public; could occasionally interact with supervisors; and could work in an environment that did not involve timed tasks, rate quotas, or frequent changes. (Tr. 115-16.)

In November 2021, King Leong, M.D., reviewed the record at the initial level of consideration and opined Mr. Oldja could perform light work so long as it involved no climbing ladders, ropes, or scaffolds and exposure to hazards and only occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling. (Tr. 113-14.)

3

In February 2022, Mehr Siddiqui, M.D., a neurologist, reviewed the record at the reconsideration level and agreed with Dr. Leong's findings. (Tr. 137-39.)

Ermias Seleshi, M.D., a psychiatrist, reviewed the medical record and opined that Mr. Oldja could understand, remember, and follow simple instructions if it did not require sustained close concentration, fast paced production, or high production standards; could interact with others on a brief, intermittent, and superficial basis with others; and could adapt to a stable work setting. (Tr. 139-40.)

### C. Relevant Medical Evidence[3]

There is no medical evidence contemporaneous with Mr. Oldja's December 2020 alleged onset date of disability. However, on January 29, 2021, Mr. Oldja went to the emergency room after his wife witnessed him having four seizures. (Tr. 617.) His wife reported that he was "resistant to seeking any medical care and [wa]s not taking any prescription medications at th[e] time." (*Id.*) He had been drinking 12 to 24 alcoholic beverages per day for the last several months and tried to stop drinking completely, "which led to him having seizures." (Tr. 619.) His treatment provider diagnosed him with withdrawal seizures. (*Id.*)

CT scans from January 30, 2021, revealed multilevel facet arthropathy, severe on the left at C7-T1, and multilevel disc osteophyte complexes resulting in mild to moderate multilevel neural foraminal and spinal canal stenoses. (Tr. 763.) A February 4, 2021, EEG suggested a bilateral cortical dysfunction that is maximum in the left hemisphere and evidence for generalized epilepsy along with evidence of moderate diffuse encephalopathy. (Tr. 955-56.)

---

[3] The summary of the medical evidence is not exhaustive. The ALJ's decision contains a detailed summary of the medical evidence. (Tr. 23-31.)

On February 12, 2021, Mr. Oldja attended a follow-up appointment. His wife reported one possible absence seizure[4] since discharge from the hospital, and Mr. Oldja complained of difficulty writing. (Tr. 601.) Mr. Oldja was evaluated for his complaints of difficulty writing on April 9, 2021. (Tr. 597.) Ted Weissfeld, M.D., did not see any signs of writing difficulty and opined that "the majority of his symptoms are due to ongoing alcohol abuse" and that Mr. Oldja "appear[ed] intoxicated" that day. (Tr. 597.) Dr. Weissfeld advised Mr. Oldja to undergo medically-supervised alcohol cessation to avoid seizures and other withdrawal symptoms. (*Id.*)

On February 17, 2021, Mr. Oldja had an initial outpatient psychological evaluation at Portage Path Behavioral Health. (Tr. 367-74.)  Mr. Oldja's "description of his problems [was] moderately tangential in nature," and he appeared "easily perplexed and unable to answer simple questions." (Tr. 367.) Mr. Oldja, however, was able to relate that he "tends to be a nervous person," and that he was seeking help for seizures and depression because both increase when he stops drinking, as well as "in winter time." (*Id.*) He reported symptoms of fatigue, forgetfulness, inattention, mood swings, nervousness, and restlessness. (Tr. 368.) He also reported having "chronic pain in [his] back and knees," though he rated his average pain level at 1/10 and denied recent or ongoing treatment for pain. (Tr. 371.) His diagnoses were mood disorder due to known physiological condition, alcohol abuse, and cannabis abuse. (Tr. 373-74.)

On March 3, 2021, Mr. Oldja acknowledged having four drinks per day in addition to daily medical marijuana, and he said that he was "employed but not currently working," which left him feeling depressed and "purposeless." (Tr. 376.) Upon examination, Mr. Oldja displayed poverty of thought and impaired attention/concentration and memory, but "good awareness of current

---

[4] An absence seizure, also called a petit mal seizure, is a type of seizure that involves brief, sudden lapses of consciousness where one "blank[s] out or stare[s] into space for a few seconds." *See Absence Seizures,* JOHNS HOPKINS MEDICINE, https://www.hopkinsmedicine.org/health/conditions-and-diseases/epilepsy/absence-seizures (last visited May 6, 2024).

events and past history" and only mild evidence of depression/anxiety, and fair judgment. (Tr. 377.) He was adequately groomed and demonstrated a normal gait and station. (*Id.*) Mr. Oldja told Kristen Shaughnessy, MSN, APRN, PMHNP-BC, that he did "not want medication to treat his depression," as he was "planning on attending AA meetings" and was also "going to Florida for … up to 2 months." (Tr. 376.)

An April 10, 2021, x-ray of Mr. Oldja's right shoulder demonstrated mild/moderate spurring at the AC joint. (Tr. 934.)  On April 23, 2021, Mr. Oldja was again hospitalized "for acute seizure [with] agitation secondary to alcohol withdrawal." (Tr. 453.) He was also found to have alcohol induced necrotizing pancreatitis (Tr. 453), a condition where part of the pancreas dies due to inflammation or injury.[5]

On June 2, 2021, Mr. Oldja saw Aijaz Sofi, M.D., regarding the necrotizing pancreatitis. (Tr. 440-42.) The "Review of Systems" section of Dr. Sofi's treatment notes indicate Mr. Oldja was positive for hearing loss, apnea, abdominal distention, and abdominal pain. (Tr. 441.) His physical examination demonstrated no abnormalities. (Tr. 442.) Dr. Sofi advised Mr. Oldja to continue to avoid alcohol. (*Id.*)

On June 15, 2021, Mr. Oldja saw Elenia Dimitriadis, M.D., for right elbow pain. (Tr. 438-39.) Dr. Dimitriadis diagnosed Mr. Oldja with bursitis. (Tr. 439.)

Mr. Oldja saw Jocelyn Bautista, M.D., on June 18, 2021, for a follow-up appointment regarding his epilepsy. (Tr. 432.) Mr. Oldja reported that, since his April 16, 2021, hospital discharge, he had 10 seizures per day, but also reported that he gradually had fewer and fewer seizures and experienced no seizures in May 2021. (Tr. 433.) He reported that he typically had one seizure per year, "except when he is trying to wean himself off" alcohol. (Tr. 434.) The

---

[5] *See Necrotizing Pancreatitis*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/necrotizing-pancreatitis (last visited May 3, 2024).

neurological examination found Mr. Oldja oriented, with clear speech, normal language, normal coordination, and normal gait (including tandem). (Tr. 436.) On August 27, 2021, Mr. Oldja again reported that his last grand mal seizure was in early May 2021, but he reported waking with tongue soreness. (Tr. 1273.)

On September 2, 2021, Mr. Oldja attended a routine follow-up visit for his pancreatitis. He reported that he has been sober for the last five months. (Tr. 1230.) Mr. Oldja was evaluated for neck and bilateral upper extremity pain on September 8, 2021. (Tr. 1266.) Examination findings noted that Mr. Oldja mobilized well from sitting to standing, had "essentially normal" gait and stance, "mildly diminished" balance, diminished cervical motion in extension and far right lateral rotation, loss of reflex in the right patella and Achilles but normal upper extremity reflexes. (*Id.*) David Williams, PA-C, detected no "signs of cervical myelopathy" and recommended physical therapy and told Mr. Oldja to "maintain normal activity" and exercise regularly. (Tr. 1266-67.)

On October 5, 2021, an eye exam yielded a prescription for corrective lenses. (Tr. 1242-47.) On November 30, 2021, a hearing test demonstrated that Mr. Oldja had bilateral mild sensorineural hearing loss consistent with noise exposure. (Tr. 1262.) Mr. Oldja's treatment provider advised him to wear hearing protection in noisy environments and told him "that his hearing loss [was] unlikely related to his medications or seizures." (*Id.*)

On December 9, 2021, Mr. Oldja returned to the epilepsy center. (Tr. 1256.) His wife reported chronic jerking in the middle of the night, once or twice a week. (*Id.*) She also reported "clear seizures" one night the week before. (*Id.*) He agreed to increase his antiseizure medication. (Tr. 1260.) On March 10, 2022, Mr. Oldja's wife reported his arm jerking had improved with the higher dose of medication, but he woke to a tongue bite every morning and had eye fluttering two to three times per week. (Tr. 1669.) Mr. Oldja agreed to undergo three days in the epilepsy

monitoring unit. (*Id.*) Following his three-day assessment in the epilepsy monitory unit, Mr. Oldja was diagnosed with psychogenic non-epileptic seizures ("PNES"), on April 5, 2022. (Tr. 1467.) He attended a follow-up appointment regarding his PNES through June 2021, reporting they were only nocturnal, so it was unclear how often he had them. (Tr. 1389, 1396, 1403, 1436.)

An April 29, 2022, EMG test confirmed "at least moderate" bilateral carpal tunnel syndrome, along with a generalized sensory-predominant polyneuropathy, axon loss type, and chronic motor radiculopathy on the right at C5 and C6-7, mild to moderate. (Tr. 1424.)

Mr. Oldja also received mental health treatment for depression and anxiety. The first instance of mental health treatment, as discussed in more detail above, was on February 17, 2021, when he reported depression and lack of motion after stopping drinking. (Tr. 367.) He continued to follow up in March, April, and July 2021. (Tr. 375, 381, 388.) On August 16, 2021, Mr. Oldja was moderately anxious and mildly depressed, but he was oriented, had normal thoughts and perceptions, good attention and concentration, and normal memory. (Tr. 1314.) At follow up appointments, Mr. Oldja reported an anxious or depressed mood, but he continued to have normal memory and good attention and concentration. (Tr. 1325-26, 1332, 1361, 1368, 1375.)

### D.  Relevant Hearing Testimony

#### 1.  Mr. Oldja's Testimony

Mr. Oldja testified that he is unable to work because he does not have "confidence in [him]self" because he has to be "monitored and reminded." (Tr. 50.) He stated that his medications make him forgetful. (*Id.*) He stated that his concentration and focus "is simply not there." (Tr. 56.) He testified that he has a psychogenic non-epileptic seizure every night in his sleep, but the only way he knows it occurred is that he wakes up with a bitten tongue. (Tr. 51.) He wakes up feeling

exhausted after a seizure. (Tr. 55.) He stated that he also had grand mal seizures, which were infrequent and under better control on medications. (Tr. 54.)

Mr. Oldja further testified that he had carpal tunnel syndrome that causes difficulty carrying things. (Tr. 58-59.) He described his hands and wrists as "very spastic," meaning that his hands will suddenly open and drop things that he is holding. (Tr. 59.) He stated that his eyesight and hearing decreased. (*Id.*) He testified that he had not sought treatment for his back—the impairment found disabling in 2015—since his last surgery and took only Advil to treat the condition. (Tr. 60-61.)

### 2.  Vocational Expert's Testimony

The VE testified that Mr. Oldja's past relevant work was employment as a carpenter and roofer. (Tr. 67.) The ALJ first asked the VE whether an individual with Mr. Oldja's age, education, and vocational experience could perform work at the light exertional level if he can never climb ladders, ropes, or scaffolds; can frequently stoop, kneel, and crouch; can occasionally balance or crawl; can frequently handle, finger, and feel; must avoid all exposure to hazards such as unprotected heights and dangerous moving machinery; can understand and remember simple three-to-four-step instructions; can occasionally interact with co-workers, supervisors, and the public on a brief and superficial basis; can perform routine, repetitive tasks but not a production rate pace such as that involved in assembly line work; and can adapt to a stable work setting where changes are infrequent and explained or demonstrated in advance. (Tr. 68.) The VE opined that the individual could not perform past relevant work but testified that this individual could perform work as a cafeteria attendant, routing clerk, and office helper. (Tr. 69.)

The ALJ then asked what the customary tolerance for absences would be for the VE's opined jobs. (*Id.*) The VE opined that an individual could be absent one day per month on a regular

basis. (Tr. 70.) The VE additionally opined that the customary tolerance of off-task behavior is 15%. (*Id.*)

Mr. Oldja's counsel asked whether the individual could perform work if they required over-the-shoulder supervision twice an hour even after a training period to remain on task. (Tr. 70-71.) The VE opined that this would limit the individual to sheltered work, which is not considered substantial gainful activity. (Tr. 71.) If the individual required redirection or over-the-shoulder supervision, the maximum tolerance additional supervision before it turned into sheltered work would be once a day. (*Id.*) Finally, Mr. Oldja's counsel asked whether the individual from the first hypothetical except limited to occasionally handling and fingering could perform work. (*Id.*) The VE opined that there would be no jobs available. (*Id.*)

## IV.    ALJ DECISIONS

In a January 2015 decision, an ALJ determined that Mr. Oldja retained the following residual functional capacity ("RFC"):

> the claimant is limited to standing/walking for two hours, and for walking short distances without the use of a cane. Moreover, the claimant should not climb ladders, ropes or scaffolds, but he may occasionally perform other postural activities. Additionally, the claimant should have no concentrated exposure to vibration, flashing lights or hazards, and he would miss in excess of two days per month secondary to his back pain and a pending surgical procedure

(Tr. 103; *see* Tr. 24.) The ALJ found Mr. Oldja to be disabled beginning in 2013 due to his back impairment, but noted that "medical improvement [wa]s expected with appropriate treatment." (Tr. 106.) Thus, the ALJ recommended a continuing disability review 18 months from the decision. (*Id.*)

In his August 2022 decision, the ALJ found that the 2015 ALJ decision was not binding, noting that there was new and material evidence (Tr. 20), including the fact that Mr. Oldja's benefits ceased in 2017 due to his failure to cooperate with continuing disability review and

engaging in work above the substantial gainful activity level from 2017 through 2020 (Tr. 24). The ALJ further found that Mr. Oldja has not engaged in substantial gainful activity since December 21, 2020, the alleged onset date. (*Id.*) The ALJ found that Mr. Oldja has the following severe impairments: cervical degenerative disc disease; bilateral carpal tunnel syndrome; alcohol-induced pancreatitis; obesity; alcohol and cannabis abuse disorders; and a seizure/conversion disorder. (*Id.*) The ALJ, however, found that none of these impairments—individually or in combination—met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1.

The ALJ determined that Mr. Oldja had the RFC to perform light work except that he can never climb ladders, ropes, or scaffolds; must avoid all exposure to unprotected heights and moving mechanical parts; can do no commercial driving; can occasionally climb ramps or stairs, balance, and crawl; can frequently stoop, kneel, crouch, handle, finger, and feel; can understand and remember simple, three to four-step instructions; can perform routine, repetitive tasks, but not at a production rate pace; is limited to occasional, brief, and superficial interaction with coworkers, supervisors, and the public; and is limited to a stable work setting where changes are infrequent and explained or demonstrated in advance. (Tr. 23-31.)

The ALJ found that Mr. Oldja is unable to perform his past relevant work. (Tr. 31.) The ALJ found that transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Mr. Oldja is not disabled regardless of whether he has transferable job skills. (Tr. 32.) Considering Mr. Oldja's age, education, work experience, and RFC, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Mr. Oldja can perform, including employment as a cafeteria attendant, routing clerk, and office helper. (Tr. 32-33.) Accordingly, the ALJ

concluded that Mr. Oldja was not disabled within the meaning of the Social Security Act since his disability onset date through the date of the ALJ's decision. (Tr. 33.)

V.      **LAW AND ANALYSIS**

A.  **Standard of Review**

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported

12

by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

### B.  Standard for Disability

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id*.

C.  **Analysis**

    1.  ***The ALJ gave Mr. Oldja's application a fresh look, and substantial evidence supports the ALJ's decision to find Mr. Oldja more capable than the ALJ found in 2015.***

Mr. Oldja argues that the ALJ erred when he did not adopt the prior ALJ's findings. (ECF No. 8, PageID#1853-57.) He contends that his condition worsened since the prior determination and that the ALJ should have adopted the prior ALJ's findings. (*See id.*) This argument lacks merit.

In *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 838 (6th Cir. 1997), an ALJ denied a claimant's initial application based on the determination that the claimant could not perform her past work but retained the residual functional capacity for sedentary work. After the claimant re-filed her disability claim, a second ALJ denied the application based on a determination that the claimant retained an RFC suitable for medium level work. *Id.* at 839. Upon review, the Sixth Circuit held that "the principles of res judicata can be applied against the Commissioner," and that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Id.* at 842.

After *Drummond*, the SSA adopted Acquiescence Ruling 98-4(6), 1998 WL 283902 (June 1, 1998). This Ruling provided that:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations, or rulings affecting the finding or the method for arriving at the finding.

1998 WL 283902, at *3.

But in *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929, 933 (6th Cir. 2018), the Sixth Circuit explained that "[w]hen an individual seeks disability benefits for a distinct period of time, each application is entitled to review." Thus, the *Earley* court held that "res judicata only 'foreclose[s] successive litigation of the very same claim.'" *Id.* ("[A] claim that one became disabled in 1990 is not the same as a claim that one became disabled in 1994."). Therefore, *Earley* "establishes that a claimant's second application is entitled to review free of any presumption that a previously determined RFC is correct." *Wahlert v. Comm'r of Soc. Sec.*, No. 5:22-cv-01324-SL, 2023 WL 4079203, at *9 (N.D. Ohio May 15, 2023) (citing *Nadjil v. Comm'r of Soc. Sec.*, No. 1:21-cv-1578-SL, 2022 WL 2820413, at *9-10 (N.D. Ohio July 8, 2022)), *report and recommendation adopted*, 2023 WL 4417397 (N.D. Ohio July 10, 2023).

Significantly, the *Earley* court recognized that "[f]resh review is not blind review. A later administrative law judge may consider what an earlier judge did if for no other reason than to strive for consistent decision making." *Earley*, 893 F.3d at 934. Thus, "when a claimant has previously filed an application for benefits an ALJ has rendered a final decision, an ALJ considering a claimant's new application encompassing a different time period may find that the prior ALJ's findings are legitimate and adopt those findings absent new and material evidence." *Black v. Comm'r of Soc. Sec.*, No. 1:20-cv-00183, 2021 WL 371730, at *16 (N.D. Ohio Feb. 3, 2021).

At the outset of the ALJ's decision, the ALJ stated that the January 2015 ALJ decision was not binding and the findings were not adopted because the record contained new and material medical and other evidence that necessitates changed findings. (Tr. 20.) In addition, the ALJ stated that revisions in the applicable legal standard to Mr. Oldja's claims required *de novo* consideration. (*Id.*) In compliance with *Earley*, the ALJ gave Mr. Oldja's claim a fresh look, found new and material evidence, and assessed a different RFC. (Tr. 20, 23-24.)

15

Mr. Oldja argues that "[t]he ALJ's determination not to adopt the prior ALJ's findings was contrary to established law and was not supported by substantial evidence." (ECF No. 8, PageID#1853.) The ALJ, however, demonstrated that Mr. Oldja's condition improved after the ALJ's 2015 decision. (Tr. 99-106.) By 2017, the ALJ observed that Mr. Oldja "was back to medium work in his long-time jobs as [a] carpenter and roofer," earning between $23,000 and $43,000 from 2017 to 2020, which was "well above" minimal substantial gainful activity. (Tr. 24); *see* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(1) ("If you are doing substantial gainful activity, we will find that you are not disabled."). The ALJ observed that Mr. Oldja's condition deteriorated at the end of 2020 such that Mr. Oldja was limited to light work and could not perform his prior long-term jobs as a carpenter and roofer at the medium exertional level. (Tr. 23, 24, 31.)

The Commissioner's argument that Mr. Oldja presents "no logical reason" as to why the ALJ should have adopted the ALJ's 2015 decision is well-taken. (ECF No. 9, PageID#1868.) Here, Mr. Oldja's condition improved to the point that he was able to perform medium exertional level work at the substantial gainful activity for over four years from 2017 to 2020. (*Id.*) Moreover, even if Mr. Oldja cites evidence supporting the opposite conclusion, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)). Accordingly, this argument fails.

### 2. *Mr. Oldja's pseudoseizures cannot medically equal Listing 11.02, and the ALJ adequately explained why they did not meet Listing 12.07.*

Mr. Oldja argues that the ALJ erred at Step Three of the sequential evaluation process when he failed to find that his psychogenic nonepileptic seizures ("PNES")[6] met the criteria of Listing 11.02B. (ECF No. 8, PageID#1857-60.) The Commissioner contends that substantial evidence supports the ALJ's decision that Mr. Oldja's PNES, also called pseudoseizures, meet or medically equal Listing 11.02 or 12.07. (ECF No. 9, PageID#1876-79.) The Commissioner's arguments are well-taken.

Appendix 1 to Subpart P of the SSA regulations contains the Listing of Impairments, which "describes impairments the SSA considers to be 'severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.'" *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. Apr. 1, 2011) (quoting 20 C.F.R. § 404.1525(a)). At Step Three of the disability evaluation process, the Commissioner must consider whether a claimant's impairments meet or medically equal any of the relevant listing requirements. An impairment that meets only some of the requirements of a listing does not qualify, despite its severity. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). Conversely, a claimant who meets the requirements of a listed impairment will be deemed conclusively disabled and entitled to benefits. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

An impairment is medically equivalent to a listed impairment in Appendix 1 if "it is at least equal in severity and duration to" the impairment's criteria. 20 C.F.R. § 404.1526(a). The SSA "can find" equivalence in one of two ways. First, if a claimant has "an impairment that is described

---

[6] Psychogenic non-epileptic seizures ("PNES"), sometimes called pseudoseizures, involve "attacks that resemble epilepsy-related seizures that are due to underlying psychological distress, not abnormal activity in [one's] brain" and are best treated by diagnosing and treating underlying psychiatric symptoms. *Psychogenic Nonepileptic Seizure (PNES)*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/24517-psychogenic-nonepileptic-seizure-pnes (last visited May 3, 2024).

in Appendix 1," the SSA will "find that [the] impairment is medically equivalent to that listing if you have other findings related to your impairment that are at least of equal medical significance to the required criteria." *Id.* § 404.1526(b)(1). Second, if a claimant's impairment is not described in Appendix 1, or if the claimant has "a combination of impairments, none of which meets a listing" in Appendix 1, the SSA "will compare [the] findings with those for closely analogous listed impairments." *Id.* § 404.1526(b)(2)-(3). The claimant bears the burden of demonstrating that she meets or equals a listed impairment at the third step of the sequential evaluation. *Peterson v. Comm'r of Soc. Sec.*, 552 F. App'x 533, 539 (6th Cir. 2014).

Mr. Oldja argues that the ALJ erred in failing to find that his pseudoseizures were medically equivalent to Listing 11.02, the listing applicable for epilepsy. This argument is misplaced. As stated above, when assessing whether an impairment is medically equivalent to a listed impairment, the SSA first asks whether a claimant has "an impairment that is described in appendix 1." 20 C.F.R. § 404.1526(b)(1). Pseudoseizures, as described under Listing 12.07, are somatic symptom and related disorders. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.07. Thus, the SSA regulations ask whether, if Listing 12.07 is not technically met, the claimant's symptoms are nonetheless medically equivalent in severity and duration to each of Listing 12.07's criteria. *See id.* § 404.1526(b)(2)-(3). Listing 11.02B explicitly states that "psychogenic nonepileptic seizures and pseudoseizures are not epileptic seizures for the purpose of [Listing] 11.02" and that the SSA "evaluate[s] psychogenic seizures and pseudoseizures under the mental disorders body system, 12.00." 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 11.00(H)(1). Accordingly, pseudoseizures would be properly evaluated for medical equivalence under Listing 12.07, a listing corresponding to mental disorders, *not* under Listing 11.02. *See LaPlante v. Comm'r of Soc. Sec.*, No. 23-1460, 2024 WL 400329, at *3 (6th Cir. Feb. 2, 2024) (stating that claimant's argument that ALJ was required

to consider whether her pseudoseizures were equivalent to epileptic seizures under Listing 11.02 "contravenes the SSA's regulations").

Here, the ALJ found that Mr. Oldja did not meet Listing 11.02 because he did not have medically determinable epilepsy. (Tr. 21.) The ALJ also found that Mr. Oldja did not equal Listing 11.02 because the record did not contain state agency findings or medical expert evidence supporting a medical equivalence finding. (*Id.*); *see* SSR 17-2p, 2017 WL 3928306, at *3. The ALJ further found that Mr. Oldja did not meet Listing 12.07 because he did not have one marked or two extreme limitations in understanding, remembering, and applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Tr. 21-22.) The ALJ's decision applied the correct legal standards and substantial evidence supports this decision.

Yet Mr. Oldja maintains that "[t]he record … established that he had the requisite number of seizures to satisfy the criteria of Listing 11.02B." (ECF No. 8, PageID#1860.) But Mr. Oldja fails to meaningfully confront the ALJ's reasoning. As stated above, he does not meet Listing 11.02B because he does not have medically determinable epilepsy. (Tr. 21.) Moreover, his PNES cannot medically equal Listing 11.02B because the regulations explicitly state that they must be considered under Listing 12.07. *See* 20 C.F.R. §§ 404.1526(a), 416.926(a); 20 C.F.R., Pt. 404, Subpt. P, App. 1, §§ 11.00(H)(1). And even if they could be analyzed under Listing 11.02B, the ALJ observed that the record did not contain the requisite evidence to support such a finding, *i.e.*, a state agency medical finding or medical expert testimony supporting medical equivalence. (Tr. 21); SSR 17-2p, 2017 WL 3928306, at *3. Finally, the ALJ found Mr. Oldja's impairments did not meet or equal Listing 12.07 because Mr. Oldja had only moderate limitations. (Tr. 21.) Because

Mr. Oldja fails to address these findings—and I find no reversible error in them—his argument fails.

### 3. *Substantial evidence supports the ALJ's SSR 16-3p assessment.*

Mr. Oldja argues that substantial evidence does not support the ALJ's SSR 16-3p assessment. In support of this argument, he recites his hearing testimony and objective medical evidence and asserts that "[i]t is clear that the evidence in this matter established that [he] satisfied the criteria set forth in [SSR] 16-3p." (ECF No. 8, PageID#1863.) He contends that the ALJ "failed to articulate any supportable rationale" for finding his statements inconsistent with the record, "failed to contain specific reasons for the finding on credibility," did not support his decision with substantial evidence, and failed to build a clear and logical bridge between the evidence and the result. (*Id.* at PageID#1864-65.) The Commissioner disagrees. (ECF No. 9, PageID#1879-82.) For the following reasons, Mr. Oldja's arguments lack merit.

Evaluating an individual's subjective symptoms is a two-step process. SSR 16-3p, 2017 WL 5180304, at *3. First, the ALJ must consider whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *Id.* The ALJ must then evaluate the intensity and persistence of the individual's symptoms and determine the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the second step, the ALJ may consider evidence directly from the claimant, or gleaned from other medical and non-medical sources (such as family and friends). *Id.*

An ALJ must consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including the daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors regarding the claimant's functional limitations. *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL

2496917, at *11 (N.D. Ohio May 14, 2020). The ALJ must also determine the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." *Id.*

An ALJ is not required to accept a claimant's subjective complaints, *Jones v. Comm'r of Soc. Sec.*, 336 F. 3d 469, 476 (6th Cir. 2003), and need not "make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). But the regulations require the ALJ to evaluate a claimant's symptoms, and the explanation must be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Rogers*, 486 F.3d at 248; *see also* SSR 16-3p, 2017 WL 5180304, at *10.

The ALJ does not need to use any "magic words," so long as it clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617-JDG, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021). The ALJ's evaluation of subjective evidence receives great deference from a reviewing court. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). Absent compelling reason, a court may not disturb the ALJ's analysis of the claimant's subjective complaints, and the conclusions drawn from it. *Id*.

Here, a review of the ALJ's decision reveals that he based his findings on multiple factors, and provided "specific reasons for the weight given to [Mr. Oldja's] symptoms." SSR 16-3p, 2017 WL 5180304, at *10. The ALJ found that Mr. Oldja had medically determinable impairments that could cause his symptoms, but that his testimony about the intensity, persistence, and limiting effects of his impairments was inconsistent with the record. (Tr. 30.)

Specifically, with respect to Mr. Oldja's seizures, the ALJ observed that while Mr. Oldja's epilepsy doctor, Dr. Bautista, instructed him on seizure precautions, she did not "advise[] or document an opinion that the claimant is disabled or even significantly limited in his capacity to maintain regular work." (Tr. 31.) Instead, Dr. Bautista told Mr. Oldja to "not work with heavy or dangerous equipment, power tools, not climb tall ladders or work at heights." (Tr. 436.) Such limitations are consistent with the RFC determination. (Tr. 436.) An ALJ may discount a claimant's subjective complaints where they are not supported by the claimant's doctors. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (the ALJ will consider "any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report").

In addition, the ALJ recognized that Mr. Oldja testified about neck, back, and musculosketelal pain, but noted that "there is no evidence that [he] pursued physical therapy as recommended."  (Tr. 30-31.) It is appropriate for an ALJ to consider a claimant's failure to follow medical advice in assessing the claimant's subjective complaints. *See Simpson v. Comm'r of Soc. Sec.¸*No. 1:14-cv-801, 2016 WL 74420, at *11 (S.D. Ohio Jan. 6, 2016) (holding that the ALJ was reasonable in discounting the claimant's complaints because "[t]he record does not show that plaintiff followed through on her treating orthopedist's suggestions despite her complaints of disabling pain" ); *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 789 (6th Cir. 2017), *aff'd sub nom. Biestek v. Berryhill*, 139 S. Ct. 1148 (2019) (approving reliance on evidence that the claimant cancelled psychology appointments and discontinued medication against medical advice as "a pattern of behavior the ALJ reasonably interpreted as undermining [the claimant's] credibility").

The ALJ also discussed the normal objective findings. *See* 20 C.F.R. § 404.1529(c)(2); SSR 16-3p, 2017 WL 5180304, at *5 ("[O]bjective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms…"). Specifically,

the ALJ discussed Mr. Oldja's "fairly unremarkable vision and hearing exams." (Tr. 31). Significantly, Mr. Oldja's November 2021 hearing exam was notable only for mild bilateral sensorineural hearing loss consistent with noise exposure. (Tr. 1262.) Mr. Oldja was advised to wear hearing protection in noisy environments, and he was further advised "that his hearing loss [was] unlikely related to his medications or seizures." (*Id.*) The ALJ also discussed the clinical findings of mild to moderate anxiety and depression, fair insight and judgment, normal memory, and good attention and concentration with minimal distractibility. (Tr. 29-30; *see* Tr. 1319-20, 1325, 1368). Mr. Oldja does not establish how the ALJ's reliance on these normal objective findings constitutes error. *See Showalter v. Kijakazi*, No. 22-5718, 2023 WL 2523304, at *3 (6th Cir. Mar. 15, 2023).

Although Mr. Oldja contends that the ALJ failed to provide specific reasons or "articulate any supportable rationale," a plain reading of the ALJ's decision refutes this contention. (ECF No. 8, PageID#1864.) An ALJ's explanation "need not be laid out like geometric proofs or a Dickens novel. It need only provide enough reasoning to allow the claimant (and a reviewing court) to understand the ALJ's thinking." *See Bruno v. Comm'r of Soc. Sec.*, No. 1:20-CV-2633, 2021 WL 6494779, at *9 (N.D. Ohio Dec. 3, 2021), *report and recommendation adopted sub nom. Bruno v. Comm'r of Soc. Sec. Admin.*, 2022 WL 125289 (N.D. Ohio Jan. 13, 2022). To assess the adequacy of the ALJ's explanation, a reviewing court, "reads the ALJ's opinion as a whole and with common sense." *Id.; see Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001) ("Judicial review of the [Commissioner's] findings must be based on the record as a whole."). Here, reading the decision as a whole and with common sense, the ALJ, as discussed above, provides discernible reasons supported by substantial evidence for discounting Mr. Oldja's allegations.

Mr. Oldja attempts to overcome the substantial evidence standard by citing evidence that he believes warrants greater limitations. But this is an improper invitation to engage in *de novo* review of his claim. It is not this Court's role to "reconsider the facts, re-weigh the evidence, resolve conflicts in the evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds*, 424 F. App'x at 414 (6th Cir. 2011). Merely reciting substantial evidence supporting one's position and concluding the opposite conclusion should have been reached is "not only unhelpful, but also mischaracterize[s] the substantial evidence standard." *Helwagen v. Comm'r of Soc. Sec.*, No. 5:22-CV-01467, 2023 WL 3727253, at *16 (N.D. Ohio Apr. 20, 2023), *report and recommendation adopted*, 2023 WL 3726575 (N.D. Ohio May 30, 2023). That is because "the Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Here, there was more than enough evidence to support the ALJ's findings and sufficient explanation to build a logical bridge between the evidence and the result. Accordingly, Mr. Oldja presents no compelling reason to disturb the ALJ's SSR 16-3p analysis. *Baumhower*, 2019 WL 1282105, at *2.

## VI.    CONCLUSION

Based on the foregoing, the Court AFFIRMS the Commissioner's final decision DENYING Mr. Oldja's applications for SSI and DIB.

**IT IS SO ORDERED.**

Dated: May 6, 2024                                                */s Jennifer Dowdell Armstrong*
                                                                      Jennifer Dowdell Armstrong
                                                                      U.S. Magistrate Judge